**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 24 2004**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

QWEST CORPORATION, a Colorado
corporation,

      Plaintiff-Appellant/
      Cross-Appellee,

v.

CITY OF SANTA FE, New Mexico,

      Defendant-Appellee/
      Cross-Appellant.

Nos. 02-2258, 02-2269

---

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. CIV-00-795 MCA/DJS)**

---

David R. Goodnight, Dorsey & Whitney, LLP, Seattle, Washington (Yana D.
Koubourlis, Sarah E. Heineman, Dorsey & Whitney, LLP, Seattle, Washington,
Roy A. Adkins, Qwest Corporation, Denver, Colorado, William R. Richardson,
Jr., Lynn R. Charytan, Wilmer, Cutler & Pickering, Washington, D.C., with him
on the briefs), for Plaintiff-Appellant/Cross-Appellee.

Joseph Van Eaton, Miller & Van Eaton, P.L.L.C., Washington, D.C. (William
Malone, Mitsuko R. Herrera, Miller & Van Eaton, P.L.L.C., Washington, D.C.,
Nann Houliston, Of Counsel, Albuquerque, New Mexico, Bruce Thompson, City
Attorney, City of Santa Fe, Santa Fe, New Mexico, with him on the briefs), for
Defendant-Appellee/Cross-Appellant.

Before **MURPHY**, **PORFILIO**, and **HARTZ**, Circuit Judges.

**MURPHY**, Circuit Judge.

## I.    INTRODUCTION

The City of Santa Fe, a political subdivision of the State of New Mexico, adopted an ordinance (the "Ordinance") which established new procedures for telecommunications providers seeking access to city-owned rights-of-way. Qwest Corporation ("Qwest") provides telecommunications services in Santa Fe and utilizes the rights-of-way. Qwest brought suit in federal district court seeking a declaration that the Ordinance is preempted by state and federal law, an injunction to prevent the enforcement of the Ordinance, and attorney's fees. Qwest argued that the Federal Telecommunications Act of 1996, 47 U.S.C. § 253 ("TCA"), and state law preempted the Ordinance. Further, Qwest argued that it was entitled to attorney's fees under 42 U.S.C. § 1988 if it prevails.

The district court concluded several sections of the Ordinance were preempted by § 253, but ruled that an action under 42 U.S.C. § 1983 was not available and, therefore, Qwest could not seek attorney's fees under § 1988. Qwest appeals, and the City cross-appeals. This court exercises jurisdiction

pursuant to 28 U.S.C. § 1291 and agrees with the district court's articulate decision in substantially all respects. This court, nevertheless, reverses in part.

## II.     BACKGROUND

The Ordinance enacted by Santa Fe placed several new requirements on telecommunications operations in Santa Fe. Under the Ordinance, providers are required to register with the City and obtain a lease agreement for the use of a right-of-way. In order to register with the City, Qwest must provide information regarding its affiliates, the location of existing telecommunications facilities, a description of the services provided, and "such other information as the city may reasonably require." In addition, the Ordinance also requires payment of a cost-based registration fee.

To obtain a lease, Qwest must submit a lease application requiring a variety of information including preliminary engineering plans and "such other and further information as may be required by the city." Qwest must also obtain an appraisal of the rental value of the right-of-way from a city-approved appraiser. The rental price for the right-of-way is based on this appraisal. Additional requirements pertain to the installation of underground conduit. The Ordinance requires the installation of excess capacity equal to 100% of what the installer plans to use. In addition, any conduit must be dedicated in fee simple to the city.

After the City receives a lease application, the Ordinance requires the City's governing body to hold a public hearing within sixty days regarding whether or not the city should enter into the lease. Before entering into the lease, the City is required to find that the lease is "in the best interest of the public." The City must consider the effect on public health, safety, and welfare; the disruption to public and private facilities; and the availability of alternate routes or locations for the proposed facility.

Qwest sought to install a four-by-four foot utility cabinet on a twelve-by-eighteen foot concrete pad on a city-owned right-of-way located on Bishop's Lodge Road in Santa Fe. In addition to the installation costs, Qwest paid $4000 in survey costs for the appraisal. The proposed annual rent was $6000. Within Santa Fe, Qwest has more than 365 such cabinets, and thousands of smaller ones. It also has an extensive network of conduit and other facilities. Qwest estimates that the excess conduit capacity required under the Ordinance would increase its costs by 59%, while the City estimates a cost increase of between 30% and 50%. It has approximately 120 planned or ongoing projects which involve City owned rights-of-way in Santa Fe. Santa Fe has advised Qwest that it will be required to enter into a similar lease or leases for any use of the City's rights-of-way. Qwest voluntarily withdrew its lease application before the process was completed.

Qwest brought suit in federal district court arguing that the Ordinance was preempted by 47 U.S.C. § 253. In pertinent part, § 253 provides as follows:

§ 253

(a) In general

No State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service.

(b) State regulatory authority

Nothing in this section shall affect the ability of the State to impose, on a competitively neutral basis and consistent with section 254 of this section, requirements necessary to preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers.

(c) State and local government authority

Nothing in this section affects the authority of a State or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public rights-of-way on a nondiscriminatory basis, if the compensation required is publicly disclosed by such government.

(d) Preemption

If, after notice and an opportunity for public comment, the Commission determines that a State or local government has permitted or imposed any statute, regulation, or legal requirement

-5-

that violates subsection (a) or (b) of this section, the Commission shall preempt the enforcement of such statute, regulation, or legal requirement, to the extent necessary to correct such violation or inconsistency.

47 U.S.C. § 253.

The district court concluded several sections of the Ordinance were preempted by the federal statute, but ruled that some provisions of the Ordinance could remain in effect. The district court also ruled that § 253 did not create a private right of action enforceable through § 1983 and, therefore, Qwest could not seek attorney's fees. Qwest appeals, arguing that the district court erred when it concluded that certain provisions of the Ordinance are not preempted by § 253. Santa Fe cross-appeals, asserting that the district court erred in concluding that any provision of the Ordinance is preempted by § 253.

## III. DISCUSSION

### A. Subject Matter Jurisdiction

This court reviews a challenge to subject matter jurisdiction *de novo*. *Morris v. City of Hobart*, 39 F.3d 1105, 1108 (10th Cir. 1994). The City argues that the district court lacked subject matter jurisdiction because federal question jurisdiction cannot be based on Qwest's argument that the Ordinance is preempted and diversity of citizenship was never established by Qwest.

The existence of federal question jurisdiction must appear on the face of the plaintiff's well pleaded complaint. *ANR Pipeline Co. v. Corporation Comm'n*

*of Okla.*, 860 F.2d 1571, 1576 (10th Cir. 1988).  Relying on *Shaw v. Delta Airlines, Inc.*, 463 U.S. 85, 96 n.14 (1983), this court has concluded that federal district courts have jurisdiction over actions seeking to enjoin the enforcement of a state regulation.  *ANR Pipeline,* 860 F.2d at 1576.

Santa Fe argues that *Shaw* applies in situations only where there is complete preemption of state regulation by a federal scheme.  Whether a federal statute completely preempts or only partially preempts local enactments can only affect the federal question analysis in a case involving removal jurisdiction.[1]  This case does not involve removal jurisdiction.  As the Supreme Court stated in *Shaw*: "A plaintiff who seeks injunctive relief from state regulation, on the ground that

---

[1]The well-pleaded complaint rule "makes the Plaintiff the master of the claim."  *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987).  By omitting federal claims from a complaint, a plaintiff can guarantee an action will be heard in state court.  *Id.*  Because the focus for purposes of federal question jurisdiction is on the plaintiff's well-pleaded complaint, it does not matter that a federal-law defense is anticipated in response to the complaint.  *Id.* at 393 ("[I]t is now settled law that a case may not be removed to federal court on the basis of a federal defense, including the defense of pre-emption, even if the defense is anticipated in plaintiff's complaint, and even if both parties concede that the federal defense is the only defense truly at issue.").  Complete preemption operates as an exception to this general rule because, in some circumstances, "the pre-emptive force of a [federal] statute is so extraordinary that it converts an ordinary state common-law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule."  *Id*. at 393.  In this case, however, the issue of pre-emption is not an anticipated defense, but is the basis for a federal claim in Qwest's complaint in federal court.  As set out below, *Shaw v. Delta Airlines, Inc.*, 463 U.S. 85 (1983) and *Verizon Maryland, Inc. v. Public Service Commission*, 535 U.S. 635 (2002) make clear that there is federal question jurisdiction in these circumstances.

such regulation is pre-empted by a federal statute which, by virtue of the Supremacy Clause of the Constitution, must prevail, thus presents a federal question which the federal courts have jurisdiction under 28 U.S.C. § 1331 to resolve." *Shaw*, 463 U.S. at 96 n.14. Our conclusion that the nature of the preemptive effect of the TCA is not relevant here is further supported by *Verizon Maryland, Inc. v. Public Service Commission*, 535 U.S. 635 (2002). In that case, concerning a claim of preemption under another section of the TCA, the Court stated that federal question jurisdiction exists "if the right of petitioners to recover under their complaint will be sustained if the Constitution and laws of the United States are given one construction and will be defeated if they are given another" unless the claim is made only to obtain jurisdiction or is insubstantial and frivolous. *Verizon*, 535 U.S. at 643 (quotation omitted). Given the language of § 253, Qwest's claim of preemption is not wholly insubstantial or frivolous. Accordingly, we conclude that the district court had federal question jurisdiction over Qwest's claim of preemption. Because we conclude that the district court had federal question jurisdiction, it is unnecessary to discuss whether there is diversity of citizenship jurisdiction.

**B.     The District Court's Rulings on Summary Judgment**

This court reviews the district court's grant of summary judgment *de novo*. *United States v. Botefuhr*, 309 F.3d 1263, 1270 (10th Cir. 2002). Summary judgment is appropriate if "there is no genuine issue as to any material fact and []

the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(c). We view the evidence in a light most favorable to the non-moving party.

*Botefuhr,* 309 F.3d at 1270.

## 1.    42 U.S.C. § 1983

Qwest argues that § 253 was intended by Congress to create a federal right

to be free of local laws or regulations that prohibit the provision of any

telecommunications service. Therefore, Qwest asserts, the district court erred in

concluding that no action under § 1983 is available.

In this circuit, the question of whether § 253 creates a right enforceable

through 42 U.S.C. § 1983 is an issue of first impression. In order to create a

federal right Congress must clearly manifest its intent to do so. *Gonzaga Univ. v.*

*Doe*, 536 U.S. 273, 280 (2002).[2] The question whether Congress intended to

create a federal right is answered in the negative where a statute "grants no

private rights to any identifiable class." *Gonzaga*, 536 U.S. at 284 (quotation

---

[2] Both parties agree that *Gonzaga* provides the appropriate test in this case. We note that the Court in *Gonzaga* addressed a statute enacted pursuant to congressional authority under the Spending Clause and the Court noted its historical reluctance to infer congressional intent to create a federal right through Spending Clause legislation. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 279-82 (2002). Neither party in this case, however, has argued that *Gonzaga* should be limited to cases involving Spending Clause enactments. Accordingly, we assume, without deciding, that *Gonzaga* provides the correct test.

omitted).  This court concludes that nothing in the text or structure of § 253 indicates an intention to create a private right.

Contrary to Qwest's assertion, the language of the statute is not focused on the benefits granted to the telecommunications providers.  Instead the statute focuses on restricting the type of telecommunications regulations a local authority may enforce.  Section 253 contains nothing analogous to the language of the rights creating statutes noted by the Supreme Court.  For instance, in *Gonzaga* the Supreme Court referred to Title IX of the Education Amendments of 1972 as an example of a statute creating individual rights through its "unmistakable focus on the benefited class." *Gonzaga*, 536 U.S. at 284.  That statute states, "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ."  20 U.S.C. § 1681(a). The language of the TCA is quite different; it focuses on limiting the actions of local government not on protecting a benefitted class.

Likewise, the structure of the Act and the legislative history do not reveal a clear congressional intent to create an individual right which can support a § 1983 claim.[3]  Several courts have noted that 47 U.S.C. § 253(d) calls on the Federal

---

[3] Several courts have noted the ambiguities of § 253.  *See, e.g.*, *BellSouth Telecomm. Inc. v. Town of Palm Beach,* 252 F.3d 1169, 1189 (11th Cir. 2001) ("In this case, analysis of the statutory language creates more questions than it answers about what causes of action Congress intended to create . . . .").

Communications Commission ("FCC") to enforce 253(a) and 253(b), but does not mention 253(c). *See, e.g.*, *BellSouth Telecomm. Inc., v. Town of Palm Beach*, 252 F.3d 1169, 1189 (11th Cir. 2001); *TCG Detroit v. City of Dearborn*, 206 F.3d 618, 623 (6th Cir. 2000). These courts have concluded that § 253(c) was omitted from FCC enforcement to allow for private actions based on § 253 against local governments.[4] *See Town of Palm Beach,* 252 F.3d at 1189-91; *TCG Detroit*, 206 F.3d at 623-24.

This analysis relies on the legislative history of modifications to the TCA introduced by Senators Feinstein, Kempthorne, and Gorton. *See Town of Palm Beach,* 252 F.3d at 1190. Senators Feinstein and Kempthorne were concerned that giving the FCC jurisdiction would impose a burden on city governments to travel to Washington D.C. in order to defend a local ordinance: "In reality this preemption provision is an unfunded mandate because it will create major new costs for cities and for States." 141 Cong. Rec. S8170 (1995) (statement of Sen. Feinstein). The focus of these concerns was the preemption authority granted to the FCC. 141 Cong. Rec. S8170 (1995).

Based on this concern, Senators Feinstein and Kempthorne drafted a version of the proposed Act that struck the FCC's jurisdiction to preempt state and local regulation. 141 Cong. Rec. S8305 (1995). Senator Gorton responded

---

[4] We note these decisions occurred prior to the Supreme Court's opinion *Gonzaga*.

with a proposal containing the current language of the Act, which omits § 253(c) from the FCC enforcement provision contained in § 253(d). 141 Cong. Rec. S8212 (1995). Senator Gorton's Amendment was designed to allow city governments to defend challenges to regulations in a local court. He described the effect of this provision as follows: "[The Gorton amendment] retains not only the right of local communities to deal with their rights of way, but their right to meet any challenge on home ground in their local district courts." 141 Cong. Rec. S8308 (1995).

Thus, the legislative history indicates that some senators were concerned about where *preemption* challenges based on § 253 would be decided, not that Congress intended to create a right of action. A federal statutory right or right of action is not required where a party seeks to enjoin the enforcement of a regulation on the grounds that the local ordinance is preempted by federal law. *See Wright Elec., Inc., v. Minn. State Bd. of Elec.*, 322 F.3d 1025, 1028 (8th Cir. 2003)*; Western Air Lines Inc. v. Port Auth.*, 817 F.2d 222, 225-26 (2d Cir. 1987).[5] A party may bring a claim under the Supremacy Clause that a local enactment is preempted even if the federal law at issue does not create a private right of action.

---

[5] Of course, the potential preemption of a local ordinance by a federal statute "does not preclude the possibility that the same federal statute may create a federal right for which § 1983 provides a remedy." *Golden State Transit Corp., v. City of Los Angeles*, 493 U.S. 103, 108 (1989). Instead, it is the lack of any clear manifestation of congressional intent to create a federal right which leads to the conclusion that § 1983 is not available.

"A claim under the Supremacy Clause simply asserts that a federal statute has taken away local authority to regulate a certain activity. In contrast, an implied private right of action is a means of enforcing the substantive provisions of a federal law." *Western Air Lines Inc.*, 817 F.2d at 225 (2d Cir. 1987). The "mere coincidence" that the federal statute, here § 253, contains preemption language does not affect that distinction. *Id.* at 226.

There is, therefore, no clear manifestation of congressional intent to create a federal right through § 253. While Qwest is correct to point out that § 255 of the statute disavows the creation of a private right, any argument that congressional silence in § 253 should, therefore, be read to create a right is undercut by examining the Act as a whole. In another section of the Act, where Congress intended to create a private right it did so clearly. *See* 47 U.S.C. § 274(e). Accordingly, we hold that the district court was correct to conclude that Qwest had no viable claim under 42 U.S.C. § 1983.[6]

---

[6] The dissent states that the language of § 253(a) "unambiguously confers a right on every entity providing telecommunications services." Dissent at 1. While it is true that a class of beneficiaries may be identified from the provision, that alone does not indicate congressional intent to create a new federal right. *California v. Sierra Club*, 451 U.S. 287, 294 (1981) ("The question is not simply who would benefit from the Act, but whether Congress intended to confer federal rights on those beneficiaries."). To determine whether congress intended to create a federal right in § 253, subsection (a) must be examined in context. Section 253 is almost entirely concerned with the actions of local government: subsections 253(b), (c), (d) make no mention whatsoever of telecommunications providers. Thus, the section as a whole does not support the dissent's assertion that the language provides a clear indication of congressional intent to create a

Finally, we note that in examining 47 U.S.C. § 332(c), another section of the TCA, the Eleventh and Ninth Circuits have concluded that § 1983 remedies are available for claims based on the TCA.  *Abrams v. City of Rancho Palos Verdes*, 354 F.3d 1094, 1098 (9th Cir. 2004)*; AT&T Wireless PCS Inc., v. City of Atlanta*, 210 F.3d 1322, 1325-27 (11th Cir. 2000), *vacated pending reh'g en banc by* 260 F.3d 1320 (11th Cir. 2001), *appeal dismissed per stipulation,* 264 F.3d 1314 (11th Cir. 2001).  Section 332(c) contains a provision allowing an adversely affected party to "commence an action in any court of competent jurisdiction."  47 U.S.C. § 332(c)(7)(B)(v).  *AT&T Wireless* explicitly relies on this language to conclude that § 332(c) creates a federal right.  210 F.3d at 1326.  Clearly, the

new federal right.
      Nor is *Cannon v. University of Chicago*, 441 U.S. 677 (1979), dispositive on this issue.  In *Universities Research Ass'n v. Coutu*, the Supreme Court examined a statute concerning minimum wage for laborers with the following language: "every contract . . . [with certain specifications] shall contain a provision stating the minimum wages to be paid various classes of laborers and mechanics . . . ." 450 U.S. 754, 756 n.1 (1981).  The court concluded that despite identifiable beneficiaries, no federal right of action was created because the act was intended to control the actions of federal agencies.  *Id.*  Likewise, in *Gonzaga Univ. v. Doe*, the Court examined a statute with an identifiable class of beneficiaries, but determined that no federal right was created.  536 U.S. 273, 279 (2002) (examining FERPA and concluding that it does not create a federal right).  These cases make clear that the examples of rights creating language found in *Cannon* are subject to qualification and dependent on context.  Given that the clear purpose of the TCA is to foster competition in order to benefit the public, it would be difficult to conclude that Congress intended to create a new federal right enforceable through § 1983 in favor of telecommunications companies.  Because we conclude that § 253 does not create a federal right, it is unnecessary to address whether § 253 contains a remedial scheme.

language of § 253 contains no comparable expression of congressional intent. That alone is sufficient to distinguish *AT&T Wireless* from the case at hand.

In *Abrams* the parties conceded that the TCA created a federal right. *Abrams*, 354 F.3d at 1096. The court, therefore, was only concerned with whether the TCA provided a comprehensive enforcement scheme such that a remedy under § 1983 would be foreclosed. *Id*. at 1096 Accordingly, it does not effect the analysis here.

## 2.    **Preemption by State Law**[7]

The district court concluded that the Ordinance was not preempted by New Mexico state law. Qwest argues that the district court's ruling is in error because the Ordinance interferes with the power of the New Mexico's Public Regulation Commission ("PRC").

Santa Fe is a "home-rule" municipality, meaning that it "may exercise all legislative powers and perform all functions not expressly denied by general law or charter." N.M. Const. art. X, § 6(D). A local enactment of Santa Fe can be preempted by state statute if a general state law denies a home-rule municipality

---

[7] "Because federal preemption of a state or local law is premised on the Supremacy Clause of the United States Constitution and because of the longstanding principle that federal courts should avoid reaching constitutional questions if there are other grounds upon which a case can be decided, we first decide whether the ordinances are preempted by [New Mexico] state law before considering" whether they are preempted by § 253. *Alltel Comm., Inc. v. City of Macon*, 345 F.3d 1219, 1221 n.2 (11th Cir. 2003).

the power to regulate a given subject. *See Las Cruces TV Cable v. N.M. State Corp. Comm'n (In re Generic Investigation Into Cable Television Serv.)*, 707 P.2d 1155, 1161 (N.M. 1985).

New Mexico's Constitution provides that: "The public regulation commission [PRC] shall have responsibility for chartering and regulating business corporations in such manner as the legislature shall provide. The commission shall have the responsibility for regulating public utilities, including . . . telephone, telegraph and information transmission companies . . . ." N.M. Const. art. XI, § 2.

Under the New Mexico Telecommunications Act ("NMTA"), the PRC may regulate rates for intrastate telecommunications services. N.M. Stat. Ann. § 63-9A-8. In addition, telecommunications companies are required to obtain certificates of public convenience and necessity ("CPCN") from the PRC before they may offer services. N.M. Stat. Ann. § 63-9A-6.

The New Mexico Supreme Court has determined that rate making is a matter of statewide concern. *City of Albuquerque v. N.M. Pub. Serv. Comm'n*, 854 P.2d 348, 357 (N.M. 1993). Matters of statewide concern are considered general law. *Id.* at 357 n.11. Thus, the NMTA constitutes a general law. The New Mexico Supreme Court has also recognized, however, that the management and control of city owned rights-of-way are generally under the authority of local government. *Id.* at 359.

Qwest recognizes that Santa Fe retains the power to set requirements necessary for the management and maintenance of the rights-of-way, but argues that the Ordinance exceeds the scope of this power by requiring some of the same information as the PRC. Qwest also argues that the Ordinance usurps the PRC's power to allow a telecommunications company to provide services thus invalidating the PRC's grant of a CPCN.

Assuming the Ordinance's information requirements create an additional burden for Qwest, that burden does not threaten the exclusive jurisdiction of the PRC. Nothing in the informational requirements of the Ordinance could possibly affect PRC's authority to regulate telecommunications companies. Accordingly, the informational requirements do not cause the Ordinance to be preempted.

Likewise, Qwest's argument that the Ordinance allows the City to invalidate the PRC's grant of a CPCN fails. Under the Ordinance, the City has the power to deny a registration application or lease application from a telecommunications company. That power, however, does not affect Qwest's permission from the PRC to offer services under the CPCN.

The authority of home rule municipalities to enter into contracts and create franchises with telecommunications companies is well established in New Mexico law. *See* N.M. Stat. Ann. § 62-1-3. The City's power to grant a lease and accept a registration application does not materially differ from a City's authority to grant franchises. In both cases, the telecommunications provider is required to

have both a CPCN and an agreement with the city before providing service. *See City of Albuquerque*, 854 P.2d at 360. Indeed, to conclude that the City's authority to deny a lease was preempted by the PRC's control of CPCNs would mean that a telecommunications provider could have access to city-owned rights-of-way without the city's permission. That conclusion would clearly be contrary to a city's authority to regulate rights-of-way. *City of Albuquerque v. N.M. Pub. Regulation Comm'n*, 79 P.3d 297, 300-01 (N.M. 2003). Thus, we conclude that the Ordinance is not preempted by state law and affirm the district court's decision in this regard.

**3. Federal Preemption**

A federal statute preempts a local ordinance when Congress expresses a clear intent to do so. *RT Communications, Inc. v. FCC*, 201 F.3d 1264, 1269 (10th Cir. 2000). 47 U.S.C. § 253 contains a clear expression by Congress of an intent to preempt local ordinances which prohibit the provision of telecommunications services. *Id.* Section 253(c), however, preserves the power of municipal authorities to manage rights-of-way and to require compensation for the use of the rights-of-way. 47 U.S.C. § 253(c). Thus, a two part test is in order. First, it must be determined whether the state or local provision in question is prohibitive in effect. If the provision is not prohibitive, there is no preemption under § 253. A regulation need not erect an absolute barrier to entry in order to be found prohibitive. *RT Communications, Inc.*, 201 F.3d at 1268-69.

-18-

If a regulation is prohibitive, the second part of the test is applied: the regulation may be saved from preemption if it fits within the requirements of § 253(c). *See Town of Palm Beach*, 252 F.3d at 1191-92; *RT Communications*, 201 F.3d at 1269 (using a similar approach to § 253(a) and § 253(b)).

   *a.  Prohibitive Effect*

   The district court ruled that section 27-2.1 and section 27-3.2 of the Ordinance were not *per se* prohibitive because they simply require telecommunications providers to register with the city and obtain a lease for the use of rights-of-way.  We agree with the district court; the mere naked requirement of a registration or lease with the city is not prohibitive within the meaning of the statute.  *See TCG Detroit*, 206 F.3d at 624; *In re Classic Telephone, Inc.*, 11 F.C.C.R. 13082, 13097 (1996).

   This court also agrees that Qwest has not shown the cost-based fees for registration and lease applications have a prohibitive effect.  Sections 27-2.4 and 27-5.2 of the Ordinance require that each application for registration or a lease "shall be accompanied by a cost-based fee to be established by resolution of the governing body, sufficient to reimburse the city for the costs of reviewing the application." Santa Fe, N.M., Santa Fe City Code §§ 27-2.4, 27-5.2 (2003). Qwest does not argue that these provisions, standing alone are prohibitive. Instead, Qwest argues that by analyzing these provisions separately from the rest of the Ordinance the district court failed to realize that the cumulative impact of

-19-

the provisions would be prohibitive.[8]  Merely allowing the City to recoup its processing costs, however, cannot in and of itself prohibit the provision of services.

Qwest also contends that the informational requirements of the registration process and lease application are prohibitive.  Leaving out certain discretionary provisions, the registration and lease applications require the following information: the identity and legal status of the registrant; a map of the location of the registrant's existing telecommunications facilities within the city; a description of the telecommunications services that the registrant is currently providing, if any; information sufficient to determine whether the registrant is subject to public right of way leasing requirements; and, a description of the transmission medium that will be used by the lessee to offer or provide telecommunications services.  Santa Fe City Code §§ 27-2.3, 27-3.3.  In addition, the lease application requires detailed preliminary engineering plans.  Santa Fe City Code § 27-3.3(D).  The complex lease application process required of Qwest does create a significant burden.  Thus, once Qwest completes the registration process it is still required to submit information for each right-of-way leased.

The Ordinance also grants Santa Fe broad discretion in determining whether or not to accept a registration or lease application.  Section 27-3.4 states:

---

[8] Whether the cumulative impact of the Ordinance is prohibitive in effect is considered below.

"Leases shall be entered into only when the governing body finds, by way of ordinance, that the lease agreement is in the best interest of the public and states the grounds for permitting the location of the facilities upon city land or facilities." Section 27-3.3(D)(16) requires that a lease application contain preliminary engineering plans with sufficient detail to identify "such other and further information as may be required by the city." Section 27-2.3(E) calls for "such other information as the city may reasonably require," to be included in the registration information. Such broad discretionary language has been repeatedly held to be prohibitive. *See, e.g., TCG New York*, 305 F.3d at 76.

These provisions allow the City "unfettered discretion" to prohibit the provision of services. *RT Communications, Inc.*, 201 F.3d at 1268. This regulatory structure denies telecommunications providers the "fair and balanced legal and regulatory environment" the TCA was designed to create. *In re Cal. Payphone Ass'n*, 12 F.C.C.R. 14191, 14206 (1997). "Taken together, these [informational and discretionary] requirements have the effect of prohibiting Qwest and other companies from providing telecommunications services . . . ." *City of Auburn*, 260 F.3d at 1176 (quotation and citation omitted); *See TCG New York*, 305 F.3d at 81.[9]

---

[9] The City argues that there is no evidence that the discretionary provisions will be applied in a discriminatory manner and the court should not presume that the City will act arbitrarily or in defiance of the law. Section 253(a) bars any legal requirement which may have the effect of prohibiting the ability of an entity

-21-

The Ordinance also creates new costs for telecommunications providers. A telecommunications provider must obtain an appraisal from a city-approved appraiser of the rental value for the right-of-way which it proposes to use. Santa Fe City Code § 27-3.3(D)(15). Section 27-5.3 of the Ordinance provides that the City will set a "fair and reasonable rental" price for leasing the right-of-way based on the appraisal.

As noted above, the proposed annual rent for a single twelve-by-eighteen foot concrete pad was $6000. Qwest notes that it has 365 roadside utility cabinets that would require approximately the same amount of space. Assuming the $6000 rental price is representative, the resulting cost increase would nearly quadruple Qwest's cost of doing business under the franchise agreement. *See Qwest Corp. v. City of Santa Fe*, 224 F. Supp. 2d 1305, 1324 (D.N.M. 2002). That estimate does not account for the costs associated with surveying, obtaining the appraisal, or the rent required for other smaller Qwest facilities. Nonetheless, it is sufficient to show that the rental provisions are prohibitive because they create a massive increase in cost.

_____

to provide telecommunications service. Thus, the provision is undoubtedly prohibitive because the city can use it to outright deny leases to a telecommunications carrier. The only issue, therefore, is whether these provisions come under the safe harbor of § 253(c). The city has the burden of demonstrating that the discretionary provisions serve the purpose of allowing it to manage the public rights-of-way and the city has failed to show that any right-of-way management issues require such discretion.

The Ordinance also raises the costs of doing business by requiring any telecommunications company installing conduit to install double capacity and dedicate the conduit to the City. Santa Fe City Code § 27-3.7(F). The district court found that the excess conduit requirements could increase Qwest's installation costs by 30 to 59%. *Qwest Corp.*, 224 F.Supp.2d at 1324-25. While section 27-3.7(G) does require anyone using the conduit to pay the company which installed it a "just and reasonable portion of costs," it is not certain that any reimbursement will occur.

The City argues that a mere increase in cost cannot be prohibitive and cites *AT&T Corp. v. Iowa Utilities Board*, 525 U.S. 366, 390 (1999) for support. Although *Iowa Utilities Board* addresses a different statutory provision, we will assume that Santa Fe is correct to assert that not every increase in costs creates a prohibition within the meaning § 253. As stated in *RT Communications*, however, an absolute bar on the provision of services is not required. 201 F.3d at 1268-69. It is enough that the Ordinance would "materially inhibit" the provision of services. *See In re Cal. Payphone Ass'n*, 12 F.C.C.R. at 14206 (1997). Given the substantial costs generated by this Ordinance, it meets that test and is prohibitive under 47 U.S.C. § 253.

Finally, we examine the cumulative impact of the Ordinance. Viewing the Ordinance as a whole does not reveal a scheme which prohibits telecommunications service through interrelated provisions. It is the substantial

increase in costs imposed by the excess conduit requirements and the appraisal-based rent that in themselves renders those provisions prohibitive, not the additional cost-based application and registration fees. Likewise, it is the free ranging discretion that is objectionable, not the interplay between the discretionary provisions and rest of the Ordinance. Accordingly, we conclude that it is the individual provisions identified above which are prohibitive and not the Ordinance as a whole.

*b.* *Safe Harbor under 47 U.S.C. § 253(c)*

Before addressing the application of § 253(c) in this case it is necessary to determine exactly what it protects. From the language of § 253(c), it is unclear whether regulations that relate to the "management of rights-of-way" must be competitively neutral and nondiscriminatory or whether those requirements apply only to regulations related to compensation. Section 253(c) provides:

> **State and local government authority**
> Nothing in this section affects the authority of a State or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public-rights of-way on a nondiscriminatory basis, if the compensation required is publicly disclosed by such government.

47 U.S.C. § 253(c).

The FCC has read the "competitively neutral" and "nondiscriminatory" requirements to apply to both compensation regulations and to the management of rights-of-way. *See In re Classic Tel.,*

*Inc*. 11 F.C.C.R. 13082, 13103 (1996).  Despite the confusing linguistic construction of § 253(c), the FCC's interpretation of the subsection is appropriate in light of the Telecommunications Act's intent to create open competition.  *See N.J. Payphone Ass'n v. Town of West New York*, 299 F.3d 235, 243-246 (3d Cir. 2002).  Allowing regulations regarding the management of rights-of-way to be discriminatory and not competitively neutral would clearly undermine the goal of free competition.  Likewise, the scant legislative history available on the topic supports the FCC's interpretation.  *Id.* at 245-47.  Accordingly, we conclude that § 253(c) saves from preemption only those regulations relating to right-of-way management and compensation which are competitively neutral and nondiscriminatory.

The provisions granting the City broad discretion to deny a lease application cannot be saved from preemption by § 253(c).  These provisions do not relate to activities ordinarily associated with the management of rights-of-way, such as control of excavation or the management of construction.  *See Auburn*, 260 F.3d at 1177 (listing examples of regulation that would be related to  right-of-way management).  Furthermore, nothing in these provisions explicitly connects them to the management of the rights-of-way.  Accordingly, because these provisions do not bear directly

on the management of rights of way, we conclude that sections 27-2.3(E), 27-3.3(D)(16), and 27-3.4 are preempted.

The provisions requiring an appraisal to determine rental value clearly relate to the City's authority under § 253(c) to require compensation for the use of rights-of-way. Such compensation, however, must be fair and reasonable, as well as nondiscriminatory and competitively neutral. The parties disagree about whether this court should measure "fair and reasonable" by the City's costs or by a "totality of the circumstances" test which would allow for higher compensation. The City acknowledges, however, that the rent required by the Ordinance is not limited to a recovery of costs. Therefore, we need only examine how the regulation fairs under a totality of the circumstances test. The Sixth Circuit, in *TCG Detroit*, adopted such a test and we use that decision as a model here. The court in *TCG Detroit* examined several factors to determine if the compensation required by the locality was fair and reasonable. These included the extent of the use contemplated, the amount other telecommunications providers would be willing to pay, and the impact on the profitability of the business. *See TCG Detroit*, 206 F.3d at 625.

Examining similar factors in this case reveals that the compensation scheme required by Santa Fe is not "fair and reasonable." Nothing in the record indicates that the "fair market value" appraisal required by the

Ordinance would take into account the limited use contemplated.[10]  In addition, the appraisal provisions do not require consideration of the non-exclusive nature of the lease rights.  The failure to consider these relevant factors together with the potential large increase in costs demonstrates that the compensation provision fails even the totality of the circumstances test for "fair and reasonable."  Accordingly, we conclude that the fair-market appraisal requirement is not saved from preemption.

Assuming that the City has demonstrated the Ordinance's conduit requirements are related to the management of the rights-of-way, we examine whether the excess capacity and dedication requirements fail to meet the other limitations of § 253(c).  We are convinced by the district court's analysis, which states that the excess conduit installation

---

[10] The City contends that on summary judgment the district court should have inferred that the appraisal will account for appropriate factors.  That response ignores the evidence offered by Qwest showing it is unclear how the fair market rental value of a right-of-way could be appraised using standard methods.  The City had the burden of demonstrating that the Ordinance came under the protection of § 253(c).  *See Bell South Communications, Inc. v. Town of Palm Beach*, 252 F.3d 1169, 1187-88 (11th Cir. 2001) (characterizing § 253(c) as an affirmative defense); *In re the Petition of Minnesota*, 14 F.C.C.R. 21697, 21704 n.26 (1997) (stating that party arguing for exception from preemption under § 253(c) has burden of showing it applies).  Because the City failed to present evidence that the appraisal of a right-of-way by standard methods would address at least the factors mentioned above, the City was not entitled to an inference in its favor.  *See Sports Unlimited Inc., v. Lankford Enter., Inc.*, 275 F.3d 996, 999 (10th Cir. 2002) (noting that a party may carry its burden on summary judgment by pointing out a lack of evidence).

requirements are not competitively neutral because they place the risk on the party who first installs any conduit. *See Qwest Corp.*, 224 F. Supp. 2d at 1330. The first party to install the conduit may never be reimbursed for the added cost of installing extra capacity and dedicating the conduit to the city because the excess capacity might never be used.[11] Santa Fe argues that this conclusion is based on the assumption that the first entrant will install an extensive network. The conclusion does not require that assumption, however, because any first time installer, whether installing a great amount of conduit or a small amount, will bear the risk described by the district court. Accordingly, we conclude that section 27-3.7(F) of the Ordinance is preempted.

While some of the informational requirements of the Ordinance are clearly related to the management of the city's rights-of-way, others are not. Specifically, it is not immediately clear how "a description of the telecommunications service that the [registrant] is currently providing" is

---

[11] Santa Fe argues that this analysis ignores section 27-5.5 of the Ordinance which allows the lease payment to be made by "any in-kind contribution" which is to be given "fair market cash value." As the district court noted, however, nothing in the Ordinance indicates that the dedicated conduit is to be considered an in-kind payment. *Qwest*, 224 F. Supp. 2d at 1330. In addition, reading the in-kind payment requirement of section 27-5.5 to include the dedicated conduit would mean that the requirement in section 27-3.7(G) of payment to the installer by other users of the excess conduit would lead to an undeserved benefit to the installer. Thus, section 27-5.5 cannot resolve the problems created by the conduit dedication requirements.

related to the management of the rights-of-way. Similarly, information requirements concerning transmission mediums; the provision of cable or video programming; and a company's line extension policies do not have a clear relationship to the management of rights-of-way. Accordingly, the provisions with these requirements, sections 27-2.3(C), 27-3.3(B),(C),(D)(10), (D)(12), (D)(13), are not saved from preemption by 253(c).

c.      *Severability*

Section 27-8.1 of the Ordinance is a severability clause which provides: "The various parts, sections and clauses of this Ordinance are hereby declared to be severable. If any part, sentence, paragraph, section or clause is adjudged unconstitutional or invalid by a court of competent jurisdiction, the remainder of the Ordinance shall not be affected thereby."

Whether the preempted provisions are severable from the remainder of the Ordinance is a matter of state law. *See Leavitt v. Jane L.*, 518 U.S. 137, 139 (1996). Under New Mexico law, a partially invalid statute must satisfy the following test to remain in force: (1) "the invalid part must be separable from the other portions without impairing the force and effect of the remaining parts"; (2) "the legislative purpose expressed in the valid portion can be given force and effect without the invalid part"; and (3) "when considering the entire act, it cannot be said that the legislature

would not have passed the remaining part if it had known that the objectionable part was invalid." *Giant Indus. Az., Inc. v. Taxation & Revenue Dep't*, 796 P.2d 1138, 1140 (N.M. Ct. App. 1990). A severability provision creates a presumption that the ordinance is divisible. *City of Albuquerque v. Cauwels & Davis Mgmt. Co.*, 632 P.2d 729, 731 (N.M. 1981).

The Ordinance as passed by the City modified chapter fourteen of the city code, as well as creating chapter twenty-seven. As may already be apparent, Qwest is concerned with the provisions contained in the new chapter twenty-seven. Qwest has not raised any issues concerning chapter fourteen as modified by the Ordinance. Chapter fourteen deals with zoning-type regulations concerning telecommunications towers and antennae. Given the distinct subject matter, it is clear that the provisions of chapter fourteen can be given force separately from the provisions preempted in chapter twenty-seven. Likewise, the legislative purpose of chapter fourteen is unaffected and chapter fourteen could have been passed on its own. Accordingly, the modifications made to chapter fourteen by the Ordinance are severable from the provisions of chapter twenty-seven preempted by § 253.

Within chapter twenty-seven, however, the preempted provisions are intertwined with other regulations. While the district court concluded that

-30-

some of the registration information requirements could be severed, we must reexamine that conclusion because this court has stricken more of the information requirements. After the preempted sections 27-2.3(B), (C), (E) are removed, little remains of the registration regulations. The removal of the preempted provisions certainly impairs the force and effect of the remaining regulations concerning the registration process. Given the interrelated nature of the provisions, we conclude that the entire registration scheme, sections 27-2.1 through 27-2.4, must fail.

As the district court noted, no part of the leasing requirements can remain after the preempted provisions are stricken because the invalid provisions are so intertwined with the leasing scheme as a whole. For instance, the discretionary best interest provision is central to the approval process. Likewise, without the appraisal process there is no method for determining the rent required. Moreover, after striking the preempted provisions from the lease application requirements, the efficacy of the application is questionable. Accordingly, we conclude that the leasing scheme, sections 27-3.1 through 27-3.5, must fail.

The remaining provisions of the Ordinance, however, can remain in effect. These provisions, regarding the co-location of telecommunications equipment, street-cut permits and other subjects unrelated to the preempted provisions, are not disturbed by the removal of the invalid provisions.

Furthermore, these requirements fulfill explicit legislative purposes articulated in the Ordinance.[12]  In sum then, we conclude that the following provisions cannot be enforced: 27-2.1, 27-2.2, 27-2.3, 27-2.4, 27-3.1, 27-3.2, 27-3.3, 27-3.4, 27-3.5, 27-3.7(F), 27-5.2, 27-5.3, 27-6.3(A),(B).

## IV.    Conclusion

As explained above, this court agrees with the district court's grant of summary judgment in almost all respects.   We **remand** with instructions for the district court to **vacate** the order regarding the preemption of the Ordinance and issue a new order consistent with this opinion.  Finally, this court **affirms** the district court's grant of summary judgment regarding the claim for attorney's fees under 42 U.S.C. § 1988.

---

[12] For instance, the legislative goals of encouraging the location of towers in non-residential areas and minimizing the total number of towers, articulated in sections 27-1.1(I),(J) would be assisted by sections requiring linear facilities to be installed in existing conduit whenever there is excess capacity.

Nos. 02-2258, 02-2269; *Qwest Corporation v. City of Santa Fe*

**HARTZ**, Circuit Judge, concurring in part and dissenting in part:

I concur in all of the majority opinion except the discussions of state preemption and § 1983.

With respect to preemption of the Ordinance by the New Mexico Telecommunications Act (NMTA), I am not as confident as the majority that none of the Ordinance is preempted. It seems to me that the "best interest of the public" provision in the Ordinance, § 27-3.4, could undermine a Public Regulation Commission determination to grant a certificate of public convenience and necessity. Nevertheless, I agree that none of the Ordinance that survives federal preemption would be preempted by state law; so it is unnecessary for me to explore the full extent of possible preemption by the NMTA.

As for § 1983, I respectfully dissent from the majority's holding that Qwest cannot pursue a § 1983 claim. In my view, 47 U.S.C. § 253 contains rights-creating language, and the City has failed to overcome the presumption that the statutory right is enforceable under § 1983.

Section 253(a) states: "No State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate

telecommunications service." This language unambiguously confers a right on every entity providing telecommunications services. Contrary to the majority, I think that this language has an "unmistakable focus on the benefited class." Cannon v. Univ. of Chicago, 441 U.S. 677, 691 (1979). The language of § 253(a) tells entities providing telecommunications services that they cannot be prohibited, directly or indirectly, from providing their services. This is not a statute, such as the one addressed in Gonzaga University v. Doe, 536 U.S. 273 (2002), that simply states that an enterprise will not qualify for federal funds if it engages in specific conduct that may injure third parties. Under such a statute, if the enterprise decides to forego federal funds, it is not prohibited from engaging in the injurious conduct. Here, in contrast, the benefitted parties (telecommunications service providers) are not merely incidental beneficiaries; they receive unconditional protection against injurious state or local governmental action.

The Supreme Court's opinion in Cannon supports my view that the language of § 253(a) confers a right on telecommunications service providers. A footnote in that opinion lists several Court cases "where the language of the statute explicitly conferred a right directly on a class of persons that included the plaintiff in the case." 441 U.S. at 690 n.13. One listed case is Santa Clara Pueblo v. Martinez, 436 U.S. 49 (1978), in which

the pertinent statute said, "'No Indian tribe . . . shall deny to any person within its jurisdiction the equal protection of the laws.'" Cannon, 441 U.S. at 691 n.13 (quoting 25 U.S.C. § 1302(8)). Paraphrasing that statute and § 253(a) only slightly, I do not see how to distinguish between "no tribe shall deny equal protection to any person" and "no local regulation shall prohibit a telecommunications entity from providing service" with respect to whether they "explicitly confer[] a right directly on a class of persons." Id. at 690 n.13. (The Cannon footnote observed that the Court had recognized a private right of action whenever the statutory language "explicitly conferred a right"—with only one exception. Id. It explained that it did not recognize a private cause of action in Santa Clara, because of "a special policy against judicial interference" in tribal affairs, Cannon, 441 U.S. at 690 n.13; see id. at 691 n.13.)

Because § 253(a) contains explicit rights-conferring language, we must apply the following rule from Gonzaga: "Once a plaintiff demonstrates that a statute confers an individual right, the right is presumptively enforceable by § 1983." 536 U.S. at 284. Overcoming the presumption is difficult. "The State may rebut this presumption by showing that Congress specifically foreclosed a remedy under § 1983 . . . either expressly, through specific evidence from the statute itself, or impliedly, by creating a comprehensive enforcement scheme that is incompatible with

-3-

individual enforcement under § 1983." Id. at 284-85 n.4 (internal citations and quotation marks omitted).

The City has failed to rebut the presumption. It devotes only one page of its answer brief to the issue. Its discussion in full is:

> **b.      Section 253 Remedies Foreclose Section 1983 Remedies.**
>
> The second part of the district court's Section 1983 analysis properly concluded that the remedial provisions of Section 253 also foreclose a Section 1983 claim. As the court recognized, Congress created a circumscribed administrative enforcement scheme for Section 253(a) under Section 253(d). It requires notice and opportunity to cure, and it requires the agency to limit its preemption to the "extent necessary" to remove the prohibition. What is not envisioned under the system are claims for damages and attorney's fees against local governments under Section 1983.
>
> The FCC's orders under subsection (d) are enforceable by injunctive writ in the district court under Section 401(b) after review under Section 402. Section 253(d) does not allow administrative cognizance of Section 253(c) questions. The FCC may however, with the concurrence of the Attorney General, seek judicial mandamus to remedy any violation of Section 253 under Section 401(a). A private individual *may* be able to by-pass the Attorney General and bring a declaratory action that a particular provision of law is unenforceable in light of the Supremacy Clause, because it is in conflict with federal law. But it would be inconsistent with the explicit statutory remedy to allow a company through such an action to obtain damages and attorney's fees which neither Section 401(a) or (b), nor 253(d) contemplates. (internal citations omitted).

Aplee. Br. at 55-56. I am not persuaded. The City has not explained how the possibility of § 1983 relief would in any way interfere with the statutory

-4-

remedial scheme.  It is not enough to say that § 1983 would provide remedies not available under the statute creating the right to be enforced under § 1983.  Otherwise there would be absolutely no purpose in a § 1983 cause of action.  The Supreme Court has recognized a § 1983 cause of action despite the availability of administrative remedies.  <u>See, e.g., Wright v. City of Roanoke Redev. & Hous. Auth</u>., 479 U.S. 418, 424 (1987) ("the administrative scheme of enforcement" did not foreclose other remedies); <u>id</u>. at 425 (requiring remedial scheme "to raise a clear inference that Congress intended to foreclose a § 1983 cause of action").

Finally, one minor observation.  I see no relevance to the creation of a private right of action in 47 U.S.C. § 274(e).  Absent subsection (e), § 274 is readily distinguishable from § 253 because it confers no individual right—it contains no rights-creating language.  Accordingly, there would be no presumptive cause of action under § 1983 to enforce § 274.  It would therefore be totally consistent for Congress to create explicitly a cause of action for § 274 violations but not for § 253(a) violations, since § 1983 could be used to enforce only the latter.