**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 22-2392
_____

CELLCO PARTNERSHIP, d/b/a Verizon Wireless

v.

THE WHITE DEER TOWNSHIP ZONING HEARING
BOARD,
Appellant
_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 4:20-cv-02438)
District Judge: Honorable Christopher C. Conner
_____

Argued: April 20, 2023

Before: HARDIMAN, PORTER, and FISHER,
*Circuit Judges*.

(Filed: July 14, 2023)
_____

Susan J. Smith **[ARGUED]**
The Law Office of Susan J. Smith
319 N. 24th Street
Camp Hill, PA 17011

    *Counsel for Appellant*

Scott E. Coburn
Pennsylvania State Association of Township Supervisors
4855 Woodland Drive
Enola, PA 17025

    *Counsel for Amicus Curiae Appellant Pennsylvania Association of Township*
    *Supervisors in Support of Appellant*

Richard M. Williams
Kevin M. Walsh, Jr.
Hourigan, Kluger, and Quinn, PC
600 Third Avenue
Kingston, PA 18704

Scott H. Angstreich
James Ruck **[ARGUED]**
Kellogg, Hansen, Todd, Figel & Frederick, PLLC
1615 M Street, N.W., Suite 400
Washington, D.C. 20036

    *Counsel for Appellee*

————————

OPINION OF THE COURT
————————

PORTER, *Circuit Judge*.

Verizon Wireless sought to erect a cell tower in White Deer Township, Pennsylvania. Because the proposed structure did not conform with local zoning ordinances, Verizon requested several variances. The White Deer Township Zoning Hearing Board (the Zoning Board) denied the requests, and Verizon sued under the Telecommunications Act (TCA). The District Court granted summary judgment for Verizon because the Zoning Board's decision had "the effect of prohibiting the provision of personal wireless services." *See* 47 U.S.C. § 332(c)(7)(B)(i)(II). We will affirm.

I

A

In White Deer Township, a four-mile gap in Verizon's wireless coverage overlays Interstate 80. Verizon customers on this stretch of highway are likely to experience "dropped calls," "ineffective call attempts," and "garbled audio." J.A. 161. This could be problematic for stranded drivers trying to reach emergency services. Verizon set out to fill the gap.

The relevant portion of White Deer Township is located within Bald Eagle State Forest. Because a 2000 Pennsylvania moratorium prohibits the construction of cell towers on state

3

forest land, Verizon's options were limited.[1] After considering several sites and antenna configurations, Verizon decided to construct a 195-foot monopole topped with a four-foot antenna on a privately owned parcel of land.

The proposed property is 1.9 acres and contains four improvements: a cabin, shed, pavilion, and privy. White Deer Pike runs along its southern edge. Verizon leased 2600 square feet, or 0.0597 acres, in the northeast corner of the property for the cell tower.

B

At the time of Verizon's application, White Deer Township permitted cell towers that complied with Zoning Ordinances §§ 307 and 432(H). Under § 307, the minimum permissible lot size was one acre. White Deer Township, Pa., Zoning Ordinance ch. 27, § 307 (2020). And under § 432(H),

---

[1] Pennsylvania imposed the "moratorium on the consideration of new applications to build towers on State forest and State park land" twenty-three years ago. J.A. 280. Although of "indefinite duration," it was purportedly intended to give the Department of Conservation and Natural Resources "the opportunity to thoroughly study and review the general issues relating to tower construction on public land." *Id.* The Federal Communication Commission asserts that "state and local moratoria on telecommunications services and facilities deployment are barred by section 253(a)" of the Telecommunications Act. Accelerating Wireline Broadband Deployment by Removing Barriers to Infrastructure Inv., 33 FCC Rcd. 7705, 7707 (2018). The lawfulness of Pennsylvania's moratorium is not before us.

4

cell towers "shall be set back from lot lines and structures a distance equal to the height of the facility, including towers and antennas, plus 10% of such height." *Id.* § 432(H). Because Verizon's proposed cell tower conformed with neither the lot size nor set back requirements, it requested seven variances.

The Zoning Board denied Verizon's variance application. In Pennsylvania, an applicant for variances must allege that the zoning ordinance "inflict[s] unnecessary hardship." 53 Pa. Stat. and Cons. Stat. Ann. § 10910.2(a) (2022). The Zoning Board found that Verizon's alleged hardship was insufficient because it was "not a hardship connected to the capacity for the property to be used reasonably, but rather, the hardship [was connected to Verizon's] capacity to use the property as desired." J.A. 225. Furthermore, the Zoning Board explained, its "set back requirements serve a legitimate zoning interest to protect the property owners, who use the property, and others who may have occasion to be immediately outside the property's perimeter, if the monopole structure fails." *Id.*

C

Verizon sued the Zoning Board in district court, claiming that it violated the TCA by denying Verizon's variance application.

Congress passed the TCA in 1996. "[I]ts primary purpose was to reduce regulation and encourage the rapid deployment of new telecommunications technologies." *Reno v. ACLU*, 521 U.S. 844, 857 (1997) (quotation marks omitted). Congress preserved local zoning authority over "the placement, construction, and modification of personal wireless service facilities," like cell towers. 47 U.S.C. § 332(c)(7)(A). But it specified that such regulation "shall not prohibit or have the

5

effect of prohibiting the provision of personal wireless services." *Id.* § 332(c)(7)(B)(i)(II).

The District Court found that the Zoning Board's decision violated the TCA because it had the effect of prohibiting personal wireless services. So it granted summary judgment for Verizon and ordered the Zoning Board to approve the variance application. The Zoning Board appealed.

## II

Because the suit was brought under 47 U.S.C. § 332(c)(7)(B)(v), the District Court had jurisdiction under 28 U.S.C. § 1331. We have jurisdiction under 28 U.S.C. § 1291.

"We review [a] grant of summary judgment de novo and draw all reasonable inferences in favor of the nonmoving party." *Downey v. Pa. Dep't of Corr.*, 968 F.3d 299, 304 (3d Cir. 2020) (internal citation and quotation marks omitted). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

We review de novo whether a zoning board's actions had the effect of prohibiting the provision of personal wireless services. *APT Pittsburgh Ltd. P'ship v. Penn Twp.*, 196 F.3d 469, 475 (3d Cir. 1999). We scrutinize zoning decisions that implicate the TCA "more closely than standard zoning decisions." *Ogden Fire Co. No. 1 v. Upper Chichester Twp.*, 504 F.3d 370, 378–79 (3d Cir. 2007) (citation omitted).

## III

We adopted a two-part test in *APT Pittsburgh* for deciding whether local government action has the effect of prohibit-

ing the provision of personal wireless services. 196 F.3d at 480. First, the provider must prove there is a significant gap in wireless service and, second, the provider must show it is filling that gap in the least intrusive manner. *Id.*

In a declaratory ruling, the Federal Communications Commission (FCC) criticized the *APT Pittsburgh* test and others like it for being too narrowly focused on coverage gaps and reflecting "an outdated view of the marketplace." Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Inv., 33 FCC Rcd. 9088, 9106–07 (2018). Instead, it interpreted the statute to prohibit government action that "materially limits or inhibits the ability of any competitor or potential competitor to compete in a fair and balanced legal and regulatory environment." *Id.* at 9102.

Under either standard, the Zoning Board's variance application denial had the effect of prohibiting the provision of personal wireless services, so it was unlawful.

A

First, we consider the Zoning Board's denial under the *APT Pittsburgh* test. At step one, a provider seeking relief under the TCA from government action must show that its wireless facility will fill "an existing significant gap" in wireless services. *APT Pittsburgh*, 296 F.3d at 480. At step two of the *APT Pittsburgh* test, the provider must show that it proposes to fill the coverage gap in the manner "least intrusive on the values that the denial sought to serve." *Id.* We require proof that the provider made a "good faith effort . . . to identify and evaluate less intrusive alternatives" such as alternative sites, alternative designs, and the use of existing structures. *Id.*

7

Verizon satisfied step one of the *APT Pittsburgh* test. It presented evidence that there is a "significant gap" in its wireless coverage in White Deer Township and that the proposed monopole cell tower would fill that gap.[2] The Zoning Board acknowledged the gap in its variance application denial and does not challenge its existence on appeal.

Verizon also satisfied step two of the *APT Pittsburgh* test. It considered several alternatives to the proposed site, but none were feasible. It considered using other wireless facilities, building a tower in a distant agricultural district, and erecting a smaller tower, but none of these options would have effectively filled the coverage gap. It considered using a Distributed Antenna System instead of a monopole but found that technology to be more suited for open areas like parks and ball fields, not highways. And it explored the possibility of using a Pennsylvania Department of Transportation facility, but that

---

[2] Previously, we have required the provider seeking relief to show that the alleged gap is not already being filled by a different provider. *APT Pittsburgh*, 196 F.3d at 480; *Omnipoint Commc'ns Enters. L.P. v. Zoning Hearing Bd. of Easttown Twp.*, 331 F.3d 386, 399 (3d Cir. 2003). But the FCC has rejected the so-called "one-provider" approach, explaining that the denial of a wireless facility application premised solely on the existence of other providers in the area is "inconsistent with the [TCA's] pro-competitive purpose." Petition for Declaratory Ruling to Clarify Provisions of Section 332(c)(7)(B), 24 FCC Rcd. 13994, 14016 (2009). Because the Zoning Board does not argue there is a gap in coverage, we need not decide whether to reaffirm or abandon the "one-provider" approach.

land was leased from the Department of Conservation and Natural Resources, so it was subject to the Commonwealth's cell tower moratorium. Finally, with no other reasonable alternative, Verizon leased a privately owned parcel within the service gap. It selected the largest one, which required the least set-back relief.

On appeal, the Zoning Board argues for the first time that Verizon should have challenged the state's moratorium or considered other alternatives: cessation of the property's residential use, removal of the property's existing structures, or the construction of a series of smaller towers.[3] Because the Zoning Board did not raise these arguments before the District Court, it did not preserve them for appeal. *Simko v. United States Steel Corp*, 992 F.3d 198, 205 (3d Cir. 2021).

Regardless, a provider need not disprove every possible alternative, and Verizon provided sufficient evidence to show that it made a good-faith effort to fill the coverage gap in the least intrusive manner. So under *APT Pittsburgh*, the Zoning Board's variance denial violated the TCA because it had the

---

[3] In its application denial, the Zoning Board posited that Verizon could not have exhausted all reasonable alternatives unless it legally challenged the Pennsylvania moratorium. But it did not renew this argument in District Court. The District Court also found that the Zoning Board "provide[d] neither evidence nor argument suggesting another location or technological means to address the service gap." App. 19. We agree with the District Court's assessment of the record.

9

effect of prohibiting the provision of personal wireless services.

## B

We now consider the zoning denial under the "materially inhibit" standard. The FCC first articulated the "materially inhibit" standard for 47 U.S.C. § 253(a) in a 1997 adjudication. 33 FCC Rcd. at 9091 (citing *California Payphone Ass'n*, 12 FCC Rcd. 14191 (1997)). Under the "materially inhibit" standard, local government action "constitutes an effective prohibition if it materially limits or inhibits the ability of any competitor or potential competitor to compete in a fair and balanced legal and regulatory market." *Id.* at 9102 (quotation marks omitted). In its 2018 regulatory guidance, the FCC adopted the "materially inhibit" standard to determine whether government action qualifies as an effective prohibition under both 47 U.S.C. § 253(a) and § 332(c)(7)(B). *Id.* at 9102–03. Because we did not hold that § 332(c)(7)(B) was unambiguous in *APT Pittsburgh* and we believe that the FCC's interpretation is a reasonable interpretation of the statute, we adopt the "materially inhibit" standard today. *See Reich v. D.M. Sabia Co.*, 90 F.3d 854, 858 (3d Cir. 1996) ("Although a panel of this court is bound by, and lacks authority to overrule, a published decision of a prior panel, . . . a panel may reevaluate precedent in light of intervening authority and amendments to statutes or regulations.").

## 1

We begin by considering the authority of the FCC's guidance under well-established principles of administrative law.

10

The FCC has statutory authority to administer 42 U.S.C. § 332(c)(7)(B). *See City of Arlington v. FCC*, 569 U.S. 290, 295, 307 (2013). So its reasonable interpretations of ambiguous provisions within § 332(c)(7)(B) are entitled to *Chevron* deference. *Chevron, U.S.A., Inc. v. Nat'l Res. Def. Council, Inc.*, 467 U.S. 837, 843–44 (1984). However, "[a] court's prior judicial construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference . . . if the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982 (2005).

We did not hold that the statute was unambiguous in *APT Pittsburgh.* In that case, we adopted the Second Circuit's two-part "effect of prohibiting" test. 196 F.3d at 479 (citing *Sprint Spectrum, L.P. v. Willoth*, 176 F.3d 630, 639 (2d Cir. 1999)). We found the Second Circuit's test persuasive, not because it was based on an unambiguous reading of the text, but because it was "[t]he most thoughtful discussion we have found" and the reading that "effects the best accommodation of the two primary goals of the TCA." *APT Pittsburgh*, 196 F.3d at 479, 480.

Nor did the Second Circuit find the statute to be unambiguous in *Willoth*. It derived step one, whether there is a substantial gap in coverage, from "[t]he plain statutory language of subsection B(i)(II)" and "the appropriate definitions set forth in the TCA." *Willoth*, 176 F.3d at 641. This description would seem to suggest a lack of ambiguity. But a closer reading shows otherwise.

First, the Second Circuit began by admitting, "[i]t would be a gross understatement to say that the [TCA] is not a

11

model of clarity." *Id.* (quoting *AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 397 (1999) (brackets omitted). Second, the court concluded that "personal wireless services" was defined "somewhat opaquely" in the TCA as "commercial mobile services, unlicensed wireless services, and common carrier wireless exchange services." *Id.* (brackets and citation omitted). It found these three terms to be "lacking in both clarity and apparent usefulness." *Id.* Nevertheless, it cobbled together statutory and regulatory definitions of these terms to conclude that "the most compelling reading of subsection B(i)(II) is that local governments may not regulate personal wireless service facilities in such a way as to prohibit remote users from reaching such facilities." *Id.* at 641–43. The court then translated this understanding to step one of its test: "In other words, local governments must allow service providers to fill gaps in the ability of wireless telephones to have access to land-lines." *Id.* at 643.

Step two of the test, whether the provider sought to fill the gap by in the least intrusive manner, was even less tethered to the text. The Second Circuit derived it from a First Circuit case. *Id.* (citing *Town of Amherst v. Omnipoint Communs. Enters., Inc.*, 173 F.3d 9, 14 (1st Cir. 1999)). The First Circuit did not perform any statutory construction in *Town of Amherst*. *See* 173 F.3d at 14.

Because we did not derive the *APT Pittsburgh* test from the unambiguous terms of the statute, the FCC's interpretation is entitled to deference under the *Chevron* framework. *See Brand X*, 545 U.S. at 983. We agree with the *Willoth* Court that the statute is "somewhat opaque," and thus ambiguous. So we

12

proceed to consider the reasonableness of the FCC's interpretation under *Chevron*.[4]

"We first set forth our understanding of the interpretation of the [TCA] that the Commission embraced." *Id.* The FCC distinguished coverage-gap-based tests, like ours, as reflecting an "unduly narrow reading of the statute and an outdated view of the marketplace." 33 FCC Rcd. at 9106. So as a general matter, the standard applies not only when a provider is attempting to fill a gap in its wireless service, but also when a provider is pursuing "the introduction of new services or the improvement of existing services." *Id.* at 9105. Under the new standard, a local government can materially inhibit personal wireless services *even if* the provider has already filled all coverage gaps.

The FCC approvingly cites three applications of the "materially inhibit" standard that guide our understanding. *Id.* at 9110–11. In *TCG New York, Inc. v. City of White Plains*, the Second Circuit held that ordinances giving the local council an

---

[4] Multiple Supreme Court Justices have expressed skepticism towards *Chevron* and other theories of agency deference. *See Baldwin v. United States*, 140 S. Ct. 690, 691 (2020) (Thomas, J., dissenting from the denial of certiorari) ("*Chevron* is in serious tension with the Constitution, the APA, and over 100 years of judicial decisions."); *Kisor v. Wilkie*, 139 S. Ct. 2400, 2425 (2019) (Gorsuch, J., concurring in the judgment) ("[T]oday's decision [affirming *Auer* deference] is more of a stay of execution than a pardon."). And it has granted certiorari to address the continued viability of *Chevron* in the October 2023 Term. *See Loper Bright Enterprises v. Raimondo*, No. 22-451 (U.S. cert granted May 1, 2023).

13

unrestricted right to reject telecommunications applications and imposing extensive application delays "materially inhibited" the right of a provider to compete in a fair marketplace. 305 F.3d 67, 76–77 (2d Cir. 2002). In *Qwest Corporation v. City of Santa Fe*, the Tenth Circuit invalidated local regulations requiring providers to adhere to excess conduit requirements and to obtain appraisals for proposed rights-of-way because they imposed a "substantial increase in costs." 380 F.3d 1258, 1271 (10th Cir. 2004). And in *Puerto Rico Telephone Company v. Municipality of Guayanilla*, the First Circuit held that a 5% gross revenue fee violated Section 253(a) because it made the provision of wireless services cost prohibitive. 450 F.3d 9, 18–19 (1st Cir. 2006).

From these cases, we derive several key points. First, "a prohibition does not need to be complete or 'insurmountable' to run afoul of" § 332. *TCG N.Y.*, 305 F.3d at 76. To require such a showing "would lead to disparities in statutory protections among providers based merely on considerations such as their access to capital and the breadth or narrowness of their entry strategies." 33 FCC Rcd. at 9109.

Second, local government action which either imposes unreasonable fees or requires a provider to accept unreasonable costs materially inhibits wireless services. *See Qwest Corp.*, 380 F.3d at 1271. Such action "materially inhibits" wireless services because it "drain[s] limited capital resources that otherwise could be used for deployment." 33 FCC Rcd. at 9115. This includes not only deployment within the local government's jurisdiction, but around the country. "[P]roviders and infrastructure builders, like all economic actors, have a finite . . . amount of resources to use for the deployment of infrastructure." *Id.* at 9118. When a local government imposes unreasonable costs in its jurisdiction, providers might be effec-

14

tively prohibited from expending capital to deploy wireless services elsewhere. "The telecommunications interests of constituents . . . are not only local. They are statewide, national and international as well." *Id.* at 9110.

Finally, the "materially inhibit" standard requires us to consider the totality of the circumstances. A legal requirement that imposes a reasonable cost on one tower in one jurisdiction may constitute an effective prohibition when aggregated across many towers, or many wireless facilities, in several jurisdictions. *Id.* at 9112; *see also P.R. Tel. Co.*, 450 F.3d at 19 (noting that a municipality's "gross revenue fee would constitute a substantial increase in costs for [the provider] in a regulatory environment that is becoming increasingly costly due to the enactment of gross revenue fees by other municipalities").

Not all local requirements violate the "materially inhibit" standard. And the FCC offers a framework for local governments to follow when enacting legal requirements for wireless facilities. It suggests that ordinances, at least for aesthetic requirements, be "(1) reasonable, (2) no more burdensome than those applied to other types of infrastructure deployments, and (3) objective and published in advance." 33 FCC Rcd. at 9132.

We find this interpretation of the text to be "a reasonable policy choice for the agency to make." *Brand X*, 545 U.S. at 986 (quoting *Chevron*, 567 U.S. at 845). The FCC first applied the "materially inhibit" standard in 1997 for evaluating effective prohibitions under 47 U.S.C. § 253(a). 33 FCC Rcd. at 9102 (citing *California Payphone Ass'n*, 12 FCC Rcd. at 14206 (quotation marks omitted)). The standard was taken up by the First, Second, and Tenth Circuits. *Id.* It tracks "the Supreme Court's own characterization of Section 253(a) as

15

'prohibit[ing] state and local regulation that impedes the provision of "telecommunications services."'" *Id.* at 9109 (quoting *Verizon Commc'ns, Inc. v. FCC*, 535 U.S. 467, 491 (2002)) (emphasis omitted). And it reflects our long-held understanding of § 253(a). *See N.J. Payphone Ass'n v. Town of W.N.Y.*, 299 F.3d 235, 242 (3d Cir. 2002) (holding that government action violates Section 253(a) when it "reduces competition and constitutes a barrier to entry").

Other than § 253(a), the phrase "effect of prohibiting" also appears in § 332(c)(7)(B)(i)(II). It would defy the "basic canon of statutory interpretation that identical words appearing in neighboring provisions of the same statute generally should be interpreted to have the same meaning," to apply one standard under § 253(a) and a different one under § 332(c)(7)(B)(i)(II). 33 FCC Rcd. at 9103; *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 170 (2012) (presumption of consistent usage). So the "materially inhibit" standard, which the FCC has applied to § 253(a) since 1997, should also apply to the "effect of prohibiting" language in § 332(c)(7)(B)(i)(II).

The "materially inhibit" standard is more consistent than the *APT Pittsburgh* test with the TCA's goals of "promoting competition, securing higher quality services for American telecommunications consumers and encouraging the rapid deployment of new telecommunications technologies." 33 FCC Rcd. at 9105 (quoting Preamble to the Telecommunications Act of 1996, Pub. Law No. 104-104, § 202, 110 Stat. 56 (1996)) (ellipses and brackets omitted). Coverage-gap-based tests are "incompatible with a world where the vast majority of new wireless builds are going to be designed to add network capacity and take advantage of new

technologies, rather than plug gaps in network coverage." *Id.* at 9107–08 (quotation marks and citation omitted).

This case reveals the inadequacy of the *APT Pittsburgh* test. The Zoning Board plausibly argued that requiring Verizon to remove the property's existing structures or to purchase the property might be less intrusive on the values that the township's set-back requirements sought to serve. But it would be unreasonable for the Zoning Board to require such extreme measures. The *APT Pittsburgh* test does not clarify how much a local government can reasonably require a provider do to avoid intruding. We think that the "materially inhibit" better answers this question, as we show in the next section.

2

Applying the FCC's standard here, the Zoning Board has materially inhibited the ability of Verizon to compete in a fair and balanced legal and regulatory market because, considering the totality of the circumstances, its application denial prevented Verizon from providing wireless services without incurring unreasonable costs.

Verizon was constrained by the Pennsylvania moratorium, service demands, and property sizes to select its chosen parcel and monopole design. When the Zoning Board denied Verizon's variance application, it claimed not to be effectively prohibiting personal wireless services because Verizon had not pursued legal remedies against Pennsylvania.[5] Like the excess

---

[5] The Zoning Board appears to believe that its bona fide zoning concerns should take priority over the moratorium. In that regard, its real issue seems to be with Pennsylvania. But Pennsylvania is not a party to this suit, and the moratorium is

conduit and appraisal requirements in *Qwest Corporation*, the Zoning Board would be imposing a "substantial increase in costs" on Verizon by demanding that it commence legal action against Pennsylvania before seeking a variance. *See* 380 F.3d at 1271.

C

On appeal, the Zoning Board argues for the "preservation of local zoning authority." Appellant's Br. 12 (quoting 47 U.S.C. § 332(c)(7)). It cites Pennsylvania, Third Circuit, and Supreme Court precedent preserving the authority of local governments to control land use through zoning, even in the face of challenges under the TCA. The Zoning Board asserts that Verizon failed to meet the requirements for a variance under Pennsylvania law and that the application denial was supported by substantial evidence.

In the TCA, Congress preserved local zoning authority only up to a point. A local government's power over zoning decisions is preempted by federal statute when its actions "prohibit or have the effect of prohibiting the provision of personal wireless services." 47 U.S.C. § 332(c)(7)(B)(i)(II); *see* U.S. Const. art. VI, § 2 ("[T]he Laws of the United States . . . shall be the supreme Law of the Land."); *Cellular Tel. Co. v. Zoning Bd. of Adjustment*, 197 F.3d 64, 70 (3d Cir. 1999) ("[L]ocal officials must always ensure that neither their general policies nor their individual decisions prohibit or have the effect of prohibiting personal wireless services."). And in this case, the question is not whether the zoning board properly applied Pennsylvania law, but whether the Zoning Board's decision

---

not at issue.

18

had the "effect of prohibiting the provision of personal wireless services." 47 U.S.C. § 332(c)(7)(B)(i)(II). It did.

The Zoning Board cites a Commonwealth Court case, *Fairview Township v. Fairview Township Zoning Hearing Board*, which held that it "cannot be the case" that "insufficiency in coverage is a hardship entitling the provider to a variance." 233 A.3d 958, 970 (Pa. Commw. Ct. 2020). This is a misunderstanding of the preemptive effect of the TCA. Section 332 does not fit within Pennsylvania zoning laws. It displaces them in certain instances. Local zoning boards can operate to the full extent of their power when regulating the placement of cell towers and the like, as long as their actions do not have "the effect of prohibiting personal wireless services." Contrary to *Fairview Township*'s interpretation, that a local zoning board decision is based on bona fide local zoning concerns or is lawful under state law tells us nothing about whether it has "the effect of prohibiting personal wireless services." 47 U.S.C. § 332(c)(7)(B)(i)(II).

In light of our decision to adopt the "materially inhibit" standard, not only does "insufficiency in coverage" ordinarily entitle a provider to a variance but so does insufficiency in network capacity, 5G services, or new technology. In the TCA, Congress recognized that "[t]he telecommunications interests of constitutions are . . . statewide, national and international." 33 FCC Rcd. at 9110. Local zoning boards, like White Deer Zoning Board, are prohibited from preventing providers from meeting those broader interests.

\*     \*     \*

White Deer Zoning Board effectively prohibited the provision of personal wireless services when it denied

Verizon's variance application. We will affirm the District Court.